UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| INTERNATIONAL AMUSEMENTS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> WILLAIM J. KITCHEN, <br><br> Defendant. | § § § § § § § § § § § § § Case No. 24-1308 |

# COMPLAINT

Plaintiff International Amusements, LLC ("International Amusements") brings this action against Defendant William J. Kitchen for a monetary judgment pursuant to Florida's Uniform Fraudulent Transfer Act, Florida Statutes §§ 726.101, *et seq.* ("FUFTA") and for relief against the fraudulent conversion of assets pursuant to Florida Statutes § 222.30.

## THE PARTIES

1. On information and belief, Defendant William J. Kitchen is, and at all relevant times was, an individual and a citizen of Florida residing in Orange County at 1637 Hempel Avenue, Windermere, Florida 34786.

2. Plaintiff International Amusements is, and at all relevant times was, a foreign limited liability company with its principal place of business in Denton

County, Texas.  Its only member is Intamin Limited.  Intamin Limited is a Maryland corporation with its principal place of business in Anne Arundel County, Maryland.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  International Amusements is a limited liability company whose sole member is a Maryland citizen and Kitchen is a Florida citizen.  The amount in controversy exceeds, exclusive of interest and costs, the sum or value of $75,000.

4. This Court has personal jurisdiction over Kitchen because he is domiciled in this District.

5. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Kitchen is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

6. This action concerns fraudulent transfers from debtors US Thrillrides, LLC and Polercoaster, LLC (collectively, "Debtors") to Kitchen in violation of the FUFTA and Kitchen should be required to pay for the assets.

**A.    Kitchen Controls Debtors and Is an Insider.**

7. Kitchen owns and controls Debtors.  Debtors were in the business of marketing and licensing the polercoaster concept, which is purportedly a patented type of roller coaster where the track is suspended from a tower structure.

8. In 2010, Kitchen entered into an Exclusive Patent License Agreement ("Exclusive License") with Polercoaster whereby he granted it the exclusive global right and license to use, make available for use, market, sublicense, distribute, integrate, implement, lease, construct, cause to be constructed, operate, cause to be operated, and otherwise commercialize and exploit the polercoaster concept and related patents. The Exclusive License also required Kitchen to disclose to Polercoaster all information related to the polercoaster concept, including trade secrets, know-how and technical information, and to do so on an ongoing basis for any future developments and improvements.

9. The Exclusive License contained noncompetition provisions that barred Kitchen from directly or indirectly exercising any rights with respect to the polercoaster concept and patents, such as licensing, marketing, selling or commercializing it, and barred him from competing with Polercoaster in any activities that diminish or could diminish Polercoaster's ability to exploit the technology.

10. The license was for a term of twenty years and was to automatically renew at Polercoaster's option for five-year terms in perpetuity. Kitchen could terminate only if Polercoaster defaulted on specified conditions.

11. Over the next decade, Polercoaster collected millions of dollars from third parties from sublicenses and other deals related to its commercialization of the polercoaster concept.

12. In addition, US Thrillrides held the "Polercoaster" trademark and also

the "Skyblazer," "Unicoaster" and "Skyspire" trademarks which relate to other ride concepts.

### B. US Thrillrides Transfers Its Cash to Kitchen After Losing at Summary Judgment and Shortly Before a Fee Award is Entered Against Debtors in the AAA Arbitration.

13. On May 28, 2015, International Amusements and Polercoaster entered into the Master Intellectual Property Agreement ("MIPA").

14. On March 24, 2020, Debtors filed a demand for arbitration with the American Arbitration Association that alleged several claims against non-party Intamin Amusement Rides Int. Corp. Est. ("IAR Liechtenstein") and International Amusements (the "AAA Arbitration") based on the MIPA's arbitration provision.

15. On April 27, 2020, IAR Liechtenstein filed a complaint in federal district court on grounds that it was not a proper party to the AAA Arbitration.[1]

16. Meanwhile International Amusements and Debtors selected a panel of three arbitrators ("Panel") pursuant to the MIPA's terms and proceeded to litigate Debtors' claims.

17. During the court of the litigation, Kitchen sent an email to IAR Liechtenstein that revealed his and Debtors' true intentions:

> "*My attorneys do not charge me hourly fees and are working solely on a contingency fee basis*. [So] I am willing and able to pursue all claims against your company for as long as it takes…. You are aware I am sure of the money you are spending on

---

[1] <u>Intamin Amusement Rides Int. Corp. Est.</u>, Case No. 6:20-cv-713-CEM-DCI, initiated in the United States District Court for the Middle District of Florida, Orlando Division.

attorneys…. [E]ven in the unlikely event that you prevail … [t]here are no factories, no buildings, and no bank accounts to go after. *All the legal expenses you will have incurred will never be recovered*."

18. On April 26, 2022, the federal district court granted summary judgment for IAR Liechtenstein, finding that it was not a proper party to the AAA Arbitration. IAR Liechtenstein had alleged its entitlement to recover attorneys' fees pursuant to contract in the event it prevailed in that action and so it filed a motion for a determination of its right to recover its attorneys' fees related to that action.

19. Shortly after losing summary judgment, US Thrillrides transferred the following amounts to Kitchen's personal bank account: $400,000 on May 9, 2022, $71,170.96 on May 10, 2022 and $25,000 on May 11, 2022. US Thrillrides has claimed that these cash transfers were supposedly repayment for a loan, however, no loan documents exist, such as a promissory note with fixed repayment date and adequate stated interest, to evidence that there was a bona fide loan as opposed to a capital contribution or something else, or to show that the cash transfers were not a distribution. The evidence will likely show, after a reasonable opportunity for further investigation and discovery, that Kitchen fraudulently converted these transferred funds to retirement accounts, or other assets exempt by law from the claims of creditors, with the intent to hinder, delay, or defraud collection by International Amusements and other creditors.

20. On May 24, 2022, Debtors submitted a request to voluntarily dismiss their claims in the AAA Arbitration against International Amusements.

21. On June 28, 2022, the Panel entered an order determining that International Amusements was the prevailing party in the AAA arbitration entitled to recover its reasonable attorneys' fees and costs.

22. On October 31, 2022, the Panel entered a final award ("AAA Award") in International Amusements' favor. The AAA Award provided that International Amusements was entitled to recover $527,887.49 in fees and costs as the prevailing party from Debtors jointly and severally pursuant to AAA Rule 47(d), the MIPA's prevailing party provision and 17 U.S.C. § 505 of the Copyright Act. The AAA Award required Debtors to pay the full amount within 30 days of its issuance. International Amusements requested payment of the AAA Award, but Debtors did not pay.

**C.     Kitchen Strips Debtors of Their Remaining Assets and Initiates Bankruptcy Proceedings to Frustrate International Amusements' Right to Collect the AAA Award.**

23. Kitchen entered into an Asset Purchase Agreement (the "APA") dated November 7, 2022, with non-party Martin & Vleminckx, LTEE ("M&V"), thereby selling or exclusively licensing several patents, copyrights and trademarks to M&V, including the "polercoaster" concept. Kitchen executed parts of the APA on his own behalf and other parts on behalf of one or both Debtors. Debtors did not receive any payments or other consideration as a result of this transaction. Instead, Kitchen received a $1,000,000 initial upfront payment and at least ten years of additional annual licensing fees that could produce several millions of dollars. The

evidence will likely show, after a reasonable opportunity for further investigation and discovery, that Kitchen fraudulently converted funds paid to him pursuant to the APA to retirement accounts, or other assets exempt by law from the claims of creditors, with the intent to hinder, delay, or defraud collection by International Amusements and other creditors.

24. In connection with the APA and shortly before its execution, Kitchen engaged in a self-dealing transaction with Polercoaster whereby Kitchen caused Polercoaster to enter into an amended license agreement with Kitchen that modified Polercoaster's Exclusive License to a much less valuable and limited license. Under the amended license, Polercoaster was barred from selling or sublicensing polercoasters anywhere other than inside the United Arab Emirates and specifically released Kitchen from the Exclusive License's noncompetition provisions. In exchange for giving up Polercoaster's Exclusive License and transferring rights to Kitchen, Polercoaster agreed to receive "$1.00" in consideration, which is manifestly not fair, full and adequate consideration, and is not reasonably equivalent value. This change caused a substantial reduction in Debtors' abilities to carry on their business and robbed them of future opportunities, including the ability to sublicense the polercoaster concept to M&V or another company.

25. Kitchen engaged in a similar self-dealing transaction with US Thrillrides (the "Assignment") whereby Kitchen caused US Thrillrides to assign the "Unicoaster" and "Skyspire" trademarks to Mr. Kitchen for "$1.00" in consideration, and he then transferred the trademarks to M&V under the APA. He

also caused US Thrillrides to assign its rights in other trademarks, including the "Polercoaster" and "Skyblazer" trademarks, to M&V as part of the APA for Kitchen's benefit, and for which US Thrillrides received no consideration. In addition, Polercoaster transferred several registered copyrights related to the polercoaster concept to M&V as part of the APA for Kitchen's benefit, and for which it received no consideration.

26. Because Debtors had not paid the AAA Award despite multiple requests to do so, on November 10, 2022, International Amusements filed an action to confirm the AAA Award.[2]

27. On December 21, 2022, Debtors filed voluntary petitions for relief under subchapter V of chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

D. **International Amusements Confirms the AAA Award.**

28. On August 17, 2023, Debtors' bankruptcy petitions were dismissed with prejudice, which lifted the automatic stay on the confirmation action.

29. On December 20, 2023, the district court confirmed the AAA Award. The clerk entered judgment the next day for $527,887.49 as the value of the AAA Award and $39,931.03 in pre-judgment interest ("Judgment"). The Judgment is accruing post-judgment interest.

30. In addition, as of the filing of this compliant, International

---

[2] *International Amusements, LLC v. US Thrillrides, LLC, et al*, Case No. 6:22-cv-2082-CEM-DCI, pending in the United States District Court for the Middle District of Florida, Orlando Division.

Amusements and Debtors are litigating whether International Amusements is entitled to recover its reasonable attorneys' fees and costs pursuant to the MIPA for post-arbitration work, both before the bankruptcy court and in connection with the confirmation action. The magistrate judge in that action issued a report and recommendation determining that International Amusements is entitled to recover such fees, however, the report and recommendation has not been ruled on by the district court and the amount of fees and costs has yet to be determined.

## FIRST CLAIM FOR RELIEF

(*Actual Fraudulent Transfer Under Fla. Stat. § 726.105(1)(a)—Cash Transfers*)

31. International Amusements hereby repeats and incorporates by this reference each and every allegation set forth in paragraphs 1 through 22 and 26 through 30, inclusive.

32. Kitchen caused US Thrillrides to transfer $496,170.96 to his personal bank account between May 9 and May 11, 2022 ("Cash Transfers").

33. At the time of the Cash Transfers, the money in US Thrillrides' bank account was an asset of US Thrillrides within the meaning of Fla. Stat. § 726.102(2).

34. The Cash Transfers were made with actual intent to hinder, delay or defraud International Amusements and/or IAR Liechtenstein from collecting on an existing or future claim against Debtors. The presence of multiple badges of fraud demonstrates actual intent to conduct fraudulent transfers:

    a. At the time of the Cash Transfers, Kitchen was an insider of US

       Thrillrides within the meaning of Fla. Stat. § 726.102(8);

b. The evidence will likely show, after a reasonable opportunity for further investigation and discovery, that the value of the consideration received by US Thrillrides was not reasonably equivalent to the assets transferred to Kitchen or the amount of the obligation supposedly incurred;

c. Before the Cash Transfers were made, Debtors lost summary judgment to IAR Liechtenstein and International Amusements had alleged its entitlement to recover its attorneys' fees from Debtors in the AAA Arbitration;

d. The Cash Transfers were substantially all of US Thrillrides' cash assets;

e. US Thrillrides was insolvent or became insolvent shortly after making the Cash Transfers;

f. The Cash Transfers occurred shortly before or shortly after a substantial debt was incurred; and

g. The evidence will likely show, after a reasonable opportunity for further investigation and discovery, that the nature of the Cash Transfers was concealed and that US Thrillrides owed no money on an existing loan, there was no enforceable loan between US Thrillrides and Kitchen, and/or there was no intent to collect any purported loan from US Thrillrides.  No loan documents exist,

such as a promissory note with fixed repayment date and adequate stated interest, to evidence that there was a bona fide loan as opposed to a capital contribution or something else, or to show that the Cash Transfers were not a distribution.

35. The Cash Transfers harmed International Amusements.

## SECOND CLAIM FOR RELIEF

(*Constructive Fraudulent Transfer Under Fla. Stat. § 726.105(1)(b)—Cash Transfers*)

36. International Amusements hereby repeats and incorporates by this reference each and every allegation set forth in paragraphs 1 through 22 and 26 through 30, inclusive.

37. Kitchen caused US Thrillrides to transfer $496,170.96 to his personal bank account between May 9 and May 11, 2022.

38. US Thrillrides did not receive reasonably equivalent value in exchange for the Cash Transfers and US Thrillrides believed or reasonably should have believed that it had or would incur debts beyond its ability to pay as they became due.

39. Kitchen accepted the Cash Transfers with full knowledge of US Thrillrides' condition.

40. The transfers harmed International Amusements.

## THIRD CLAIM FOR RELIEF

(*Actual Fraudulent Transfer Under Fla. Stat. § 726.105(1)(a)—Exclusive License*)

41. International Amusements hereby repeats and incorporates by this

reference each and every allegation set forth in paragraphs 1 through 18, 20 through 24 and 26 through 30, inclusive.

42. Kitchen caused Polercoaster to enter into an amended license agreement with Kitchen that modified Polercoaster's Exclusive License to a much less valuable and limited license that transferred to Kitchen the valuable portions of Polercoaster's exclusive global license to the polercoaster concept and patents.

43. At the time of the amendment, the Exclusive License was an asset of Polercoaster within the meaning of Fla. Stat. § 726.102(2).

44. The transfers were made with actual intent to hinder, delay or defraud International Amusements and/or IAR Liechtenstein from collecting on an existing or future claim against Debtors. The presence of multiple badges of fraud demonstrates actual intent to conduct fraudulent transfers:

   a. At the time of the transfers, Kitchen was an insider of Polercoaster within the meaning of Fla. Stat. § 726.102(8);

   b. The value of the consideration received by Polercoaster was not reasonably equivalent to the assets transferred to Kitchen by the amendment to the Exclusive License;

   c. Before the amendment was made, Debtors lost summary judgment to IAR Liechtenstein and the Panel entered the AAA Award against Debtors and in favor of International Amusements;

   d. The amendment caused the transfer of substantially all of Polercoaster's assets;

    e. Polercoaster was insolvent or became insolvent shortly after the amendment was made;

    f. The amendment occurred shortly before or shortly after a substantial debt was incurred; and

    g. The evidence will likely show, after a reasonable opportunity for further investigation and discovery, that the nature of the amendment to the Exclusive License was concealed.

45. The amendment harmed International Amusements.

## FOURTH CLAIM FOR RELIEF

(*Constructive Fraudulent Transfer Under Fla. Stat. § 726.105(1)(b)—Exclusive License*)

46. International Amusements hereby repeats and incorporates by this reference each and every allegation set forth in paragraphs 1 through 18, 20 through 24 and 26 through 30, inclusive.

47. Kitchen caused Polercoaster to enter into an amended license agreement with Kitchen that modified Polercoaster's Exclusive License to a much less valuable and limited license that transferred to Kitchen the valuable portions of Polercoaster's exclusive global license to the polercoaster concept and patents.

48. Polercoaster did not receive reasonably equivalent value in exchange for the amendment and Polercoaster believed or reasonably should have believed that it had or would incur debts beyond its ability to pay as they became due.

49. Kitchen caused Polercoaster to amend the Exclusive License with full knowledge of Polercoaster's condition.

50. The amendment harmed International Amusements.

### FIFTH CLAIM FOR RELIEF

(*Actual Fraudulent Transfer Under Fla. Stat. § 726.105(1)(a)—IP Assignments*)

51. International Amusements hereby repeats and incorporates by this reference each and every allegation set forth in paragraphs 1 through 18, 20 through 23 and 25 through 30, inclusive.

52. In connection with the APA, Kitchen (a) caused US Thrillrides to assign the "Unicoaster" and "Skyspire" trademarks to Kitchen, which he then transferred to M&V, (b) caused US Thrillrides to assign its rights in the "Polercoaster" and "Skyblazer" trademarks to M&V, and (c) caused Polercoaster to transfer several registered copyrights related to the polercoaster concept to M&V (collectively, the "IP Assignments"). Kitchen caused all consideration for these IP Assignments to be directed to himself and not Debtors.

53. At the time of the IP Assignments, the trademarks and copyrights were assets of Debtors within the meaning of Fla. Stat. § 726.102(2).

54. The IP Assignments were made with actual intent to hinder, delay or defraud International Amusements and/or IAR Liechtenstein from collecting on an existing or future claim against Debtors. The presence of multiple badges of fraud demonstrates actual intent to conduct fraudulent transfers:

   a. At the time of the transfers, Kitchen was an insider of Debtors within the meaning of Fla. Stat. § 726.102(8);

   b. The value of the consideration received by Debtors was not

      reasonably equivalent to the value of the IP Assignments;

c. Before the IP Assignments were made, Debtors lost summary judgment to IAR Liechtenstein and the Panel had entered the AAA Award against Debtors and in favor of International Amusements;

d. The IP Assignments transferred substantially all of Debtors' remaining assets;

e. Debtors were insolvent or became insolvent shortly after the IP Assignments were made;

f. The IP Assignments occurred shortly before or shortly after a substantial debt was incurred; and

g. The evidence will likely show, after a reasonable opportunity for further investigation and discovery, that the nature of the IP Assignments was concealed.

55. The IP Assignments harmed International Amusements.

## SIXTH CLAIM FOR RELIEF

(*Constructive Fraudulent Transfer Under Fla. Stat. § 726.105(1)(b)—IP Assignments*)

56. International Amusements hereby repeats and incorporates by this reference each and every allegation set forth in paragraphs 1 through 18, 20 through 23 and 25 through 30, inclusive.

57. In connection with the APA, Kitchen (a) caused US Thrillrides to assign the "Unicoaster" and "Skyspire" trademarks to Kitchen, which he then transferred to M&V, (b) caused US Thrillrides to assign its rights in the

"Polercoaster" and "Skyblazer" trademarks to M&V, and (c) caused Polercoaster to transfer several registered copyrights related to the polercoaster concept to M&V. Kitchen caused all consideration for these IP Assignments to be directed to himself and not Debtors.

58. Debtors did not receive reasonably equivalent value in exchange for the IP Assignments and Debtors believed or reasonably should have believed that they had or would incur debts beyond Debtors' ability to pay as they became due.

59. Kitchen caused Debtors to make the IP Assignments with full knowledge of Debtors' condition.

60. The IP Assignments harmed International Amusements.

## SEVENTH CLAIM FOR RELIEF

*(Fraudulent Conversion Under Fla. Stat. § 222.30—Cash Transfers and Funds Paid Pursuant to the APA)*

61. International Amusements hereby repeats and incorporates by this reference each and every allegation set forth in paragraphs 1 through 30, inclusive.

62. Kitchen received $496,170.96 from US Thrillrides in the form of the Cash Transfers and at least $1,000,000 in connection with the APA.

63. The evidence will likely show, after a reasonable opportunity for further investigation and discovery, that Kitchen fraudulently converted all or a portion of these funds ("Converted Funds") to retirement accounts, or other assets exempt by law from the claims of creditors, with the intent to hinder, delay, or defraud collection by International Amusements and other creditors.

64. The evidence will likely show, after a reasonable opportunity for further investigation and discovery, the presence of multiple badges of fraud demonstrating intent to hinder, delay or defraud creditors:

   a. Kitchen obtained the Converted Funds via fraudulent transfers under FUFTA;

   b. Before the Converted Funds were converted to exempt assets, Debtors lost summary judgment to IAR Liechtenstein;

   c. Before the Converted Funds were converted to exempt assets, International Amusements had alleged its entitlement to recover its attorneys' fees from Debtors in the AAA Arbitration and/or the Panel had entered the AAA Award against Debtors and in favor of International Amusements;

   d. Kitchen converted all or substantially all of the Converted Assets to exempt assets, leaving him with insufficient non-exempt assets to cover future fraudulent transfer actions; and

   e. The evidence will likely show, after a reasonable opportunity for further investigation and discovery, that Kitchen concealed his conversion of the Converted Funds to exempt assets.

## PRAYER

WHEREFORE, International Amusements respectfully requests that the Court grant the following relief:

   a. That the Court enter a monetary judgment against Kitchen pursuant to

Fla. Stat. §§ 726.108 and 726.109(2) in the amount of $496,170.96 for the Cash Transfers from US Thrillrides to Kitchen;

b. That the Court enter a monetary judgment against Kitchen pursuant to Fla. Stat. §§ 726.108 and 726.109(2) in an amount up to the total Judgment (including any subsequent award of International Amusements' attorneys' fees and costs against Debtors) for the transfers to Kitchen caused by the amendment to Polercoaster's Exclusive License.

c. That the Court enter a monetary judgment against Kitchen pursuant to Fla. Stat. §§ 726.108 and 726.109(2) in an amount up to the total Judgment (including any subsequent award of International Amusements' attorneys' fees and costs against Debtors) for transfers of Debtors' property, including trademarks and copyrights, in connection with the APA.

d. That the court enter a judgment against Kitchen pursuant to Fla. Stat. § 222.30(3)(a) avoiding the conversion of all Converted Funds to the extent necessary to satisfy the Judgment (including any subsequent award of International Amusements' attorneys' fees and costs against Debtors).

e. That the Court enter an award against Kitchen for International Amusements' litigation costs; and

f. That the Court award such other relief to International Amusements as it may deem just and proper.

Respectfully submitted,

DATED:  July 18, 2024

*/s/*

Gerald E. Hawxhurst – Lead Counsel
(*pro hac vice* forthcoming)
Texas State Bar No. 24090636
jerry@hawxhurstllp.com
Kyle Foltyn-Smith
(*pro hac vice* forthcoming)
Texas State Bar No. 24090636
kyle@hawxhurstllp.com
HAWXHURST LLP
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
Tel: (512) 522-4995
Fax: (512) 522-4961


 */s/ Derek J. Angell*
Derek J. Angell
Fla. State Bar No. 73449
dangell@ohalaw.com
O'Connor Haftel & Angell
800 North Magnolia Avenue,
Suite 1350
Orlando , FL 32803
Tel: (407) 843-2100

*Attorneys for Plaintiff International Amusements, LLC*